UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

THINK TANK, INC.,

    Plaintiff,

v.

ITEGRITY, INC.,
HARINDER BAWA and
MICHELLE ROSSI,

    Defendants.

Civil Action No. TDC-22-1587

## MEMORANDUM OPINION

Plaintiff Think Tank, Inc. ("Think Tank") has filed a civil action against Defendants ITegrity, Inc. ("ITegrity"), Harinder Bawa, and Michelle Rossi, alleging statutory claims and common law torts relating to the departure of Bawa and Rossi from Think Tank to go work for ITegrity, a competitor firm. Defendants have filed a Motion to Dismiss, which Think Tank opposes. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss will be DENIED.

## BACKGROUND

Plaintiff Think Tank asserts the following facts in the Amended Complaint, which the Court accepts as true for the purposes of resolving the Motion. Think Tank is a government contracting company specializing in information technology and professional services. Think Tank's majority owner and Chief Executive Officer is Anju Kaur, who owns 51 percent of the shares of the company. Defendant Harinder Bawa ("Bawa"), Kaur's husband until their divorce

on January 14, 2020, was President and Treasurer of Think Tank and owned 49 percent of its shares. At the time of the events giving rise to this case, Kaur and Bawa were in the midst of their "somewhat contentious" divorce. Am. Compl. ¶ 30, ECF No. 1-6.

Defendant ITegrity is also a government contracting company and was founded by Tarandeep Bawa, a former employee of Think Tank and Harinder Bawa's cousin. Prior to 2019, Defendant Michelle Rossi worked for Think Tank as its Program, Quality, and Human Resources Manager. In April 2019, Rossi informed Think Tank that she planned to accept a competing job offer, and she resigned from Think Tank on May 1, 2019. On May 30, 2019, Kaur was informed by Tarandeep Bawa that Rossi had been hired by ITegrity. Think Tank alleges that Harinder Bawa facilitated Rossi's move to ITegrity.

Upon her departure from Think Tank, Rossi took with her a company laptop computer and cell phone which she had used to perform her duties. Think Tank alleges that Bawa had told Rossi that she could keep the computer and cell phone. At some point, Bawa copied all of the Think Tank proprietary information from Rossi's laptop computer onto a thumb drive, but the information was never removed from the computer. In addition, after Rossi's departure, certain paper and electronic documents to which Rossi had access, including her employment agreement, were found to be missing from Think Tank's files. Though Think Tank contacted Rossi through counsel to demand the return of the computer, cell phone, and any other Think Tank property, the items were not returned.

Around the time of Rossi's departure in May 2019, Bawa informed Kaur that he was going to take a three-month vacation. From that point forward, Bawa did not visit the Think Tank office, stopped working to support current contracts or to prepare proposals for new contracts, did not support daily operations, and refused to sign needed financial paperwork. Because of Bawa's

2

inaction, the Defense Security Service delayed the processing of a request by Think Tank to receive a Secret Facility Clearance sponsorship necessary for Think Tank to have employees with a Secret-level clearance work on a new contract, which caused Think Tank to lose Secret-cleared employees who were hired away by the prime contractor to service that contract. According to Think Tank, during this time frame, Bawa mismanaged Think Tank funds, including by using corporate funds for personal expenses, and he allowed another Think Tank manager who had resigned to keep a Think Tank laptop computer.

Sometime after May 2019, Bawa began working with ITegrity while he was still President of Think Tank. According to Think Tank, while serving in both roles, Bawa caused Think Tank to miss opportunities to pursue contracts as a prime contractor and to secure follow-on contract opportunities. For example, in September 2020, ITegrity received two contracts from the National Oceanic and Atmospheric Administration ("NOAA") that were follow-on awards to two contracts on which Think Tank had been the prime contractor and ITegrity had a been a subcontractor.

Think Tank alleges that during this time period, Bawa used Think Tank confidential and proprietary information to assist ITegrity in pursuing some of the same contracts which Think Tank was pursuing. It also alleges that Bawa assisted ITegrity in recruiting Think Tank employees to go work at ITegrity.

Because of these actions, Bawa was terminated and removed as an officer of Think Tank on December 31, 2021. At that time, Think Tank instructed Bawa to return company property in his possession, including account log-in information, and it changed the account passwords for email and other company accounts to prevent Bawa from accessing them. However, because Bawa had originally set up Think Tank's email system through a third-party vendor, Bawa retained "super-user access" to Think Tank's email servers without the knowledge of other officers and

3

employees of Think Tank. *Id.* ¶ 66. Thus, Bawa continued to access Think Tank's email system for several months without the company's knowledge. Specifically, Bawa used a super-user account to access Kaur's Think Tank email account and forwarded incoming and outgoing emails to himself and third parties. The account was finally disabled in late April 2022. Think Tank alleges that the information accessed by Bawa through the super-user account was "highly sensitive information" such as "extensive information regarding Think Tank's contract and bids including . . . correspondences with clients and business partners, drafts and finals of proposals and bids, invoices, financial data and other internal discussions." *Id.* ¶¶ 83, 85.

On April 12, 2022, Think Tank filed this action in the Circuit Court for Montgomery County, Maryland, and it filed an Amended Complaint on May 10, 2022. ITegrity removed the action to this Court on June 27, 2022. In its Amended Complaint, Think Tank alleges a total of 14 counts. Count 1 asserts a claim against Bawa for breach of his fiduciary duty as President of Think Tank. Count 2 asserts a claim against all Defendants for misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law II, § 11-1201 (West 2022), based on Bawa's and Rossi's actions in retaining and disclosing Think Tank's trade secrets and proprietary information. Count 3 asserts a common law claim against Bawa and Rossi for conversion of Think Tank's confidential and proprietary information and of the cell phone and laptop computer retained by Rossi.

Counts 4 and 5 asserted claims for breach of contract and intentional interference with business or contractual relations, respectively, against ITegrity in relation to a 2015 subcontract under which Think Tank, which had a task order on a contract with NOAA, engaged ITegrity as a subcontractor (the "NOAALink Subcontract"). Count 4 alleged that by soliciting and hiring Rossi, ITegrity violated Article XXXVI of the NOAALink Subcontract, which provides that during the

term of the NOAALink Subcontract and "for one (1) year thereafter, each party agrees not to solicit for employment or hire any of the employees of the other party without the prior written consent of the other party." NOAA Link Subcontract art. XXXVI, Mot. Dismiss Ex. 2, ECF No. 24-2. Count 4 also alleged that by communicating directly with NOAA relating to the contract, ITegrity violated another provision of the NOAALink Subcontract that required any contacts made by ITegrity with NOAA to be made with the knowledge and concurrence of Think Tank.

Count 6 asserts a claim against ITegrity for aiding and abetting Bawa's alleged breach of his fiduciary duty to Think Tank. Count 7 asserts a claim against Rossi for breach of contract for alleged violations of her employment agreement with Think Tank, including by violating a non-competition provision and by disclosing Think Tank confidential information to ITegrity. Count 8 asserts a claim of a common law conspiracy to misappropriate Think Tank's trade secrets against ITegrity, Bawa, and Rossi. Count 9 asserts a claim against Bawa and ITegrity for a violation of the Wiretap Act, 18 U.S.C. § 2511 (2018), related to Bawa's unauthorized use of the super-user account. Count 10 asserts a claim against Bawa and ITegrity under the Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-410 (West 2022), also related to Bawa's use of the super-user account. A second count identified as Count 10, which the Court will refer to as "Count 10a" asserts a claim against Bawa for a violation of the Stored Communications Act, 18 U.S.C. § 2707, relating to Bawa's use of the super-user account. Count 11 asserts a claim against Bawa for violations of Maryland's Stored Communications Act, Md. Code Ann., Cts. & Jud. Proc. § 10-4A-08, arising from the same set of actions. Count 12 alleges violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, based on Bawa's unauthorized access of Think Tank computer systems. Count 13 asserts a claim against Rossi, also for a violation of the CFAA, based on her retention of the Think Tank laptop computer and cell phone.

On August 10, 2022, after Defendants provided notice that they intended to file a Motion to Compel Arbitration, Think Tank filed a Joint Stipulation of Dismissal of Counts 4 and 5, of the breach of contract and tortious interference claims based on or relating to the NOAALink Subcontract. The Court approved the Joint Stipulation on August 11, 2022.

## DISCUSSION

In their Motion to Dismiss and Compel Arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4 (2018), Defendants argue that this case must be dismissed to allow Think Tank's claims to be decided in arbitration based on the terms of an arbitration clause contained in the NOAALink Subcontract ("the arbitration clause"). Defendants argue that the arbitration clause clearly and unmistakably delegates arbitrability decisions to the arbitrator, which would require this Court to dismiss the action to allow an arbitrator to make such determinations. Think Tank opposes the Motion on the grounds that under the language of the arbitration clause, arbitrability was not delegated to the arbitrator with legally sufficient clarity, and that the arbitration clause does not cover the present dispute.

**I.    The Arbitration Clause**

ITegrity asserts that this action must be referred to arbitration pursuant to the arbitration clause in the NOAALink Subcontract, which was entered into on November 15, 2011 by Think Tank, the prime contractor, and ITegrity, the subcontractor. The term of the NOAALink Subcontract ran "from the subcontract award date and continuing through 16th of September, 2020." NOAALink Subcontract, art. IV(A), Mot. Dismiss Ex. 1, ECF No. 24-2. As relevant here, the NOAALink Subcontract contains the following arbitration clause in Article XXXII(C) under the subheading entitled "Disputes":

> In the event a dispute arises between the parties relating to or arising out of this Subcontract . . . such dispute shall be submitted to final and binding arbitration in

>the Washington, D.C. metropolitan area under the rules of the American Arbitration Association or another nationally recognized arbitration organization, pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1, et seq.

NOAALink Subcontract art. XXXII(C). Pursuant to the NOAALink Subcontract, the parties also agreed to be bound by a clause in Article XVIII entitled "Confidentiality of Information," which provides in part, and subject to certain exceptions not relevant here, that "Subcontractor agrees not to appropriate Proprietary Information to its own use or to disclose such information to third parties unless specifically authorized by Prime Contractor in writing," and that this obligation extends for "a period of two (2) years from the termination of this Subcontract." NOAALink Subcontract art. XVIII(A), (G).

ITegrity asserts in its Motion that the arbitration clause binds Think Tank to submit its claims to arbitration because the claims relate to or arise out of the NOAALink Subcontract. Further, ITegrity argues that regardless of whether this Court agrees that the claims in the Amended Complaint relate to or arise out of the NOAALink Subcontract, the language of the arbitration clause provides that the question of whether the claims are arbitrable is to be decided by the arbitrator, so the Court must send the matter to arbitration to allow such determinations to be made.

## II. Arbitrability

The FAA provides a "policy favoring arbitration" which makes "arbitration agreements as enforceable as other contracts." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). When faced with a motion to compel arbitration, courts generally engage in a two-step inquiry. First, the court must determine who decides whether a particular dispute is arbitrable: the arbitrator or the court; second, if the court concludes that it is "the proper forum in which to adjudicate arbitrability" the court decides "whether the dispute is, in fact, arbitrable." *Peabody Holding Co.,, LLC v. United*

7

*Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012). Because "arbitration is a matter of contract," "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Accordingly, the Court must decide whether the NOAALink Subcontract "clearly and unmistakably" provides that the "arbitrator shall determine what disputes the parties agreed to arbitrate." *Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999).

When "two sophisticated parties expressly incorporate into a contract" standard rules of arbitration "that delegate questions of arbitrability to an arbitrator, then that incorporation constitutes the parties' clear and unmistakable intent to let an arbitrator determine the scope of arbitrability." *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 529 (4th Cir. 2017), *abrogated on other grounds by Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528-29 (2019). Under this principle, the United States Court of Appeals for the Fourth Circuit held in *Simply Wireless* that because the arbitration clause at issue expressly stated that the arbitration would be conducted pursuant to the rules and procedures of the Judicial Arbitration & Mediation Services ("JAMS"), and those rules provide that the question of whether claims are arbitrable is to be decided by the arbitrator, the district court was required to allow an arbitrator to make that determination. *Id.* at 525, 527-28. Here, the arbitration clause states that disputes will be "submitted to final and binding arbitration in the Washington, D.C. metropolitan area under the rules of the American Arbitration Association ("AAA") or another nationally recognized

8

arbitration organization[.]" NOAALink Subcontract art. XXXII(C). Because the AAA's rules call for questions of arbitrability to be decided by the arbitrator, ITegrity argues that, under *Simply Wireless*, this Court must send the case to arbitration to resolve the issue of whether Think Tank's claims are subject to arbitration.

In fact, however, there is a crucial difference in the language of the arbitration clause in the NOAALink Subcontract as compared to the arbitration clause at issue in *Simply Wireless*. Instead of stating that, as in *Simply Wireless*, the parties agreed to conduct the arbitration under the specific rules of a specific arbitration organization such as JAMS or AAA that explicitly delegates arbitrability questions to the arbitrator, the NOAALink Subcontract arbitration clause states that claims arising under the NOAALink Subcontract will be submitted to arbitration in the Washington, D.C. area "under the rules of the American Arbitration Association *or another nationally recognized arbitration organization*." NOAALink Subcontract art. XXXII(C) (emphasis added). Thus, the arbitration clause contains an agreement to follow the rules of *some* arbitral body, but not necessarily AAA. Under the plain language of the arbitration clause, the rules of any such arbitral organization that could be applied by an arbitrator in the Washington, D.C. area could be a valid choice under the agreement.

Although Defendants assert that the major national arbitration organizations generally follow the same approach as JAMS or AAA on arbitrability, the arbitration clause explicitly does not bind the parties to follow any particular organization's rules, does not require the parties to use the rules of an organization with any particular rule on arbitrability, and plainly leaves open the possibility that the parties could select an organization's rules, current or future, that do not direct that the question of arbitrability be decided by the arbitrator. At a minimum, therefore, the arbitration clause does not demonstrate "clear and unmistakable" intent to arbitrate arbitrability.

See *Simply Wireless*, 877 F.3d at 526. In the absence of such clear and unmistakable evidence of intent, the Court must retain and decide the issue of arbitrability. *See Carson*, 175 F.3d at 329.

### III.    ITegrity

Next, the Court must determine whether the claims are arbitrable. *See Peabody Holding Co.*, 665 F.3d at 101. The claims against ITegrity are: misappropriation of trade secrets (Count 2); aiding and abetting a breach of fiduciary duty (Count 6); conspiracy to misappropriate trade secrets (Count 8); and violations of the Federal Wiretap Act (Count 9) and the Maryland Wiretap Act (Count 10).

Based on the FAA, there is a "heavy presumption of arbitrability" under which "when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996). At the same time, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Under the arbitration clause, Think Tank and ITegrity agreed to submit to arbitration any "dispute that arises between the parties relating to or arising out of" the NOAALink Subcontract. NOAALink Subcontract art. XXXII(C). In considering an arbitration clause with similarly broad language, under which any dispute that "ar[ose] out of or related to" the agreement was subject to arbitration, the Fourth Circuit held that this language "rendered arbitrable all disputes having a significant relationship to the . . . agreement regardless of whether those claims implicated the terms" of the agreement. *Am. Recovery Corp.*, 96 F.3d at 93. Such a significant relationship can exist where the claims involved "derive[] from the specific relationship created by the relevant agreement." *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 766, 769 (4th Cir. 2006) (considering an arbitration clause requiring arbitration of any dispute "arising out of, or

10

relating to" the agreement). In assessing whether there is such a significant relationship, a court "must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim." *Am. Recovery Corp.*, 96 F.3d at 93 (quoting *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988)). Thus, the Court must consider, as to each count against ITegrity, whether the relevant factual allegations in Think Tank's Amended Complaint bear a significant relationship to the NOAALink Subcontract.

In *Wachovia Bank*, the Fourth Circuit considered whether, when the parties have two distinct relationships, an arbitration clause covering disputes "arising out of, or relating to" the first relationship can compel arbitration of disputes arising under and relating to the second relationship. *Wachovia Bank*, 445 F.3d at 766, 767. In that case, the parties had two distinct relationships: one under which Wachovia was a financial advisor to the defendant pursuant to a Financial Services Advisory Contract, and a second under which Wachovia served as a lender to the defendant pursuant to a Note which contained the arbitration clause. *Id.* at 768. In considering whether the arbitration clause in the Note could compel arbitration of the claims in the case, the court found that the claims arose from and related to the financial advisor relationship, not the lender relationship, because they were all grounded in the factual question of whether Wachovia wrongfully induced the defendant to engage in a particular investment. *Id.* Accordingly, in applying the "significant relationship" test, the court held that because the "two roles . . . were distinct," and the claims at issue "will require no inquiry into the Note's terms, nor even knowledge of the Note's existence," arbitration was not required. *Id.*

As in *Wachovia Bank*, the claims against ITegrity relate to factual allegations distinct from the NOAALink Subcontract. The underlying basis for this case is an internal Think Tank dispute

11

under which there was a breakdown in the working relationship between its owners, Kaur and Bawa, in the same time frame in which they were pursuing a divorce, which resulted in Bawa taking actions to depart Think Tank, join a competitor company owned by his cousin, and allegedly bring Think Tank's trade secrets along with him. ITegrity's role, as alleged in the Amended Complaint, was as a willing recipient of the information and personnel brought by Bawa from its competitor, Think Tank. With the dismissal of Counts 4 and 5, there is no connection between the allegations in the Amended Complaint and the NOAALink Subcontract. As in *Wachovia Bank*, the resolution of the dispute "will require no inquiry into" the NOAALink Subcontract's "terms, nor even knowledge of [its] existence." *Id.*

As to the specific counts against ITegrity, Counts 2 and 8, which allege misappropriation of trade secrets and a conspiracy to misappropriate trade secrets, focus on Bawa's actions in taking Think Tank information when he moved to ITegrity, including by using the super-user account to continue to extract data for several months, and Rossi's retention of Think Tank information contained on the company laptop computer she retained when she moved to ITegrity. There are no allegations that Bawa specifically sought to extract information and data relating to the NOAALink Subcontract, or that any such information was contained on the laptop computers that he permitted Rossi and another departing employee to retain. Likewise, the allegations relating to Counts 9 and 10, which assert that ITegrity and Bawa violated federal and state wiretap laws when Bawa used the super-user account to extract information from Think Tank's computer system, focus on Bawa's general efforts as he departed Think Tank to steal information from Think Tank, not any effort to steal information relating to the NOAALink Subcontract.

Furthermore, the most significant events relating to Counts 2 and 8, and all of the events relating to Counts 9 and 10, took place outside of the term of the NOAALink Subcontract. The

NOAALink Subcontract ended on September 16, 2020. Bawa's use of the super-user account to extract information from Think Tank after his termination occurred from January to April 2022, long after the Subcontract's termination. Although ITegrity asserts that the NOAALink Subcontract's restrictions relating to "Confidentiality of Information" continued for two years after the end of the term, to September 2022, that provision relates to the use or misuse of information exchanged as part of the execution of the NOAALink Subcontract, *see* NOAALink Subcontract art. XVIII, not the electronic theft of internal Think Tank electronic files by its former president immediately following his termination. In any event, the fact that this conduct occurred long after the term of the NOAALink Subcontract, and did not specifically relate to materials relating to that contract, further illustrates that the claims do not have a significant relationship with the NOAALink Subcontract.

Finally, Count 6, which alleges that ITegrity aided and abetted Bawa's alleged breach of his fiduciary duty to Think Tank, bears no relationship to the NOAALink Subcontract whatsoever. Bawa's fiduciary responsibilities arose in the context of his position as a corporate officer at Think Tank dating back to the early 1990s, and to the extent that ITegrity's alleged assistance in that violation implicated a contractual relationship, it was Bawa's relationship with Think Tank, not the NOAALink Subcontract.

For all of these reasons, the Court finds that the claims against ITegrity in Counts 2, 6, 8, 9, and 10 arise from a separate relationship—based on ITegrity's alleged efforts to assist Bawa in moving from a competitor company in which the majority owner was his ex-wife to a company in which the majority owner was his cousin—that was unrelated to the NOAALink Subcontract. *See Wachovia Bank*, 445 F.3d at 768-69. Accordingly, the Court finds that these counts do not bear a "significant relationship" to the NOAALink Subcontract and thus do not arise under or relate to

13

that contract, as necessary to be covered by the arbitration clause. *Am. Recovery*, 96 F.3d at 94. The Motion will therefore be denied as to the claims against ITegrity because they are not subject to arbitration.

## IV.  Bawa and Rossi

As for the claims against Bawa and Rossi, because they were not parties to the NOAALink Subcontract, the arbitration clause does not specifically apply to them. Nevertheless, Defendants argue that those claims should nevertheless be subjected to arbitration under the doctrine of equitable estoppel. "Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir. 2000). In the context of an argument that a non-signatory to a contract should be bound by its arbitration clause, equitable estoppel applies "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the ... agreement in asserting its claims against the nonsignatory." *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 395-96 (4th Cir. 2005) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). This principle exists because "[i]t is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Wachovia Bank*, 445 F.3d at 769 (quoting *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981)). Equitable estoppel does not require that a signatory assert a cause of action for breach of the contract and may still apply when, "in substance," the complaint is "based on" the nonsignatory's alleged "breach of the obligations and duties assigned" in the agreement, regardless of the legal label assigned to the claim. *Am. Bankers Ins. Grp. v. Long*, 453 F.3d 623, 628 (4th Cir. 2006).

14

The claims against Bawa are Count 1, breach of fiduciary duty; Count 2, misappropriation of trade secrets; Count 3, conversion; Count 8, conspiracy to misappropriate trade secrets; Count 9, a violation of the federal Wiretap Act; Count 10, a violation of the Maryland Wiretap Act; Count 10a, a violation of the federal Stored Communications Acts; Count 11, a violation of the Maryland Stored Communications Act; and Count 12, a violation of the CFAA. The claims against Rossi are Counts 2, 3, and 8; Count 7, breach of Rossi's employment contract; and Count 13, a violation of the CFAA.

As to Bawa, the allegations in the Amended Complaint relating to the claims against him do not assert any breach of the NOAALink Subcontract by anyone and do not rely in any way on the terms of the NOAALink Subcontract. The factual predicate for those claims generally consists of the following allegations: Bawa breached his fiduciary duty to Think Tank by neglecting his duties and obligations to the company and by assisting ITegrity in competitive contracting activities instead of Think Tank; Bawa authorized Rossi and another employee to take Think Tank company computers with them upon their departures from the company; and Bawa took other Think Tank trade secrets and proprietary information for use by ITegrity, including by using a super-user account to access Think Tank's email systems after his dismissal. The Amended Complaint, following the dismissal of Counts 4 and 5, thus does not rely on the existence or terms of the NOAALink Subcontract to support its claims against Bawa. If Think Tank and ITegrity had never entered into the NOAALink Subcontract, Think Tank would still have the same claims. Because Think Tank is not attempting to vindicate any rights under the NOAALink Subcontract and does not rely on it to advance its claims, equitable estoppel does not apply to the claims against Bawa. *See R.J. Griffin v. Beach Club II Homeowners Ass'n, Inc.*, 384 F.3d 157, 163-64 (4th Cir.

2004) (declining to apply equitable estoppel to compel arbitration because the nonsignatory did not seek a direct benefit from the contract but instead sought to enforce common law legal duties).

Likewise, equitable estoppel does not apply to the claims against Rossi. The factual allegations underlying those claims are that Rossi engaged in conversion, misappropriation of trade secrets, and a violation of the CFAA when she took her company laptop computer with her upon her departure from Think Tank, and that she breached the non-competition and confidentiality provisions of her employment contract with Think Tank. These claims neither "literally" nor "obliquely" assert a breach of a duty created by NOAALink Subcontract. *Am. Bankers Ins. Grp.*, 453 F.3d at 629. Although Rossi is alleged to have breached a contract, it is her employment contract as a Think Tank employee, and Count 7 in no way relies on the existence or language of the NOAALink Subcontract. Where the claims against Bawa and Rossi do not "rely on the terms of" the NOAALink Subcontract, equitable estoppel does not apply to compel arbitration. *Brantley*, 424 F.3d at 395-96. The Motion will therefore be denied as to the claims against Bawa and Rossi.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and Compel Arbitration will be DENIED. A separate Order shall issue.

Date: June 9, 2023

THEODORE D. CHUANG
United States District Judge