**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **THINK TANK, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. MJM-22-1587** |
| **v.** | * | |
| | * | |
| **ITEGRITY, INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This case involves a litany of allegations brought by Think Tank, Inc. ("Think Tank" or "Plaintiff") against its former President, Harinder Bawa; its former employee, Michelle Rossi; and ITegrity, Inc. ("ITegrity") (collectively, "Defendants"), a company that now employs both Bawa and Rossi. The matter is before the Court on Defendants' Motion for Summary Judgment on all counts *See* ECF 100. No hearing is necessary to resolve the pending motion. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated herein, Defendants' motion shall be granted in part and denied in part.

## I.     PROCEDURAL HISTORY

On April 12, 2022, Think Tank filed this civil action against Harinder Bawa, Michelle Rossi, and ITegrity, Inc. (collectively, "Defendants") in the Circuit Court of Maryland for Montgomery County, and it filed an Amended Complaint on May 10, 2022. ECF 5. Defendants removed the action to this Court on June 27, 2022. ECF 1. Think Tank filed a Second Amended Complaint ("SAC") on October 11, 2023, ECF 56 (SAC), to which Defendants filed an answer to on October 25, 2023, ECF 57 (Ans.). The SAC asserts the following claims against Defendants:

Count I: Breach of Fiduciary Duties (against Bawa)

Count II: Misappropriation of Trade Secrets, Maryland Uniform Trade Secrets Act (against ITegrity, Bawa, and Rossi)

Count III: Conversion (against Bawa and Rossi)

Count IV: Aiding and Abetting Breach of Fiduciary Duty (against ITegrity)

Count V: Breach of Contract (against Rossi)

Count VI: Conspiracy (against ITegrity, Bawa, and Rossi)

Count VII: Federal Wiretap Act (against Bawa and ITegrity)

Count VIII: Maryland Wiretap Act (against Bawa and ITegrity)

Count IX: Federal Stored Communications Act (against Bawa)

Count X: Maryland Stored Communications Act (against Bawa)

Count XI: Federal Computer Fraud and Abuse Act (against Bawa)

Count XII: Federal Computer Fraud and Abuse Act (against Rossi)

Count XIII: Misappropriation of Trade Secrets, Federal Defend Trade Secrets Act (against ITegrity, Bawa, and Rossi)

*See* SAC ¶¶ 93–225;

Following discovery, Defendants moved for summary judgment on all counts. ECF 100. Think Tank filed an opposition, and Defendants filed a reply.  ECF Nos. 116 & 118, respectively.

## II.    FACTUAL BACKGROUND

In March 1992, Anju Kaur and her then-husband, Harinder Bawa, formed Think Tank, Inc., a government contracting company specializing in information technology and scientific, technical, and professional services. SAC ¶¶ 8–10; Ans. ¶¶ 8–10. Since Think Tank's inception, Kaur has been CEO, and she owns 51% of the company's shares. SAC ¶¶ 13–14; Ans. ¶¶ 13–14. Bawa owns 49% of the shares and served as Think Tank's President and Treasurer from March 1992 until December 31, 2021. SAC ¶ 15; Ans. ¶ 15.

2

Think Tank was dormant for most of the 1990s, but that changed in 1998 when Bawa left his position at Oracle as a technical account manager and brought government contract work from the National Weather Service, a department within the National Atmospheric and Oceanic Administration ("NOAA"), with him to Think Tank. ECF 100-4 (Bawa Dep.) at 13:2-13, 20:9-19. Think Tank earned more work from the National Weather Service, which led to the company's growth. *Id.* at 20:12-19. During this time, Kaur worked for a different company and dealt with bouts of illness. *See* ECF 100–3 (Kaur Dep.) at 66–67.

In 2000, Think Tank hired more employees, including Bawa's cousin, Tarandeep Bawa. ECF 100-5 (Tarandeep Dep.) at 11:13–19. Tarandeep[1] left Think Tank in 2009 and formed ITegrity, a government contracting company operating in the same field as Think Tank. SAC ¶¶ 24–25; Ans. ¶¶ 24–25. Tarandeep presently serves as ITegrity's President and CEO. SAC ¶ 25; Ans. ¶ 25. ITegrity has been a subcontractor to, or teamed with, Think Tank on certain projects in the past. SAC ¶ 24; Ans. ¶ 24.

In 2003, Think Tank successfully applied to the U.S. Small Business Administration's 8(a) Business Development Program, which is a nine-year government-sponsored initiative designed to "set-aside competition for minority owned businesses." ECF 116-2 (Kaur Dep.) at 42–43. Once a business obtains 8(a) certification, the business has access to federal contracts, mentorship, and other resources. ECF 116 at 6.; ECF 100-1 at 8. In 2006, Think Tank hired Michelle Rossi. ECF 100-7 (Rossi Dep.) at 15; ECF 116-5 (Rossi Dep.) at 22. Around this time, NOAA awarded Think Tank its "NOAALink" contract, which provided Think Tank with a steady and lucrative stream of work over the next ten years. Bawa Dep. at 40:2–6. NOAA awarded Think Tank several NOAALink related task orders such as task orders for NOAA's Advanced Weather Interactive

---

[1] To distinguish Tarandeep Bawa from Harinder Bawa, the Court will refer to the former by his first name and the latter by his surname. The Court does not intend any disrespect.

Processing System ("AWIPS"), Radar Product Improvement ("RPI"), NFMS Fishery Research Analysis and Monitoring, and Management Analysis and Reporting System ("MARS"). ECF 116-6 (Pl.'s Ans. to ITegrity's First Set of Interrogss, Interrog. No. 7).

In 2019, Kaur assumed a more active role in Think Tank. SAC ¶ 29; Ans. ¶ 29. By then, her divorce proceedings with Bawa, which began in 2018, "had become somewhat contentious." SAC ¶¶ 20, 30; Ans. ¶¶ 20, 30. Concerned about her financial stability during the divorce, including her ability to cover expenses and medical bills, Kaur exercised her authority as majority shareholder to remove the Board of Directors and add herself to the company's bank accounts. *See* Kaur Dep. 85:10–86:14, 89:8–90:4. At the time, she believed the company was performing well. *Id.* at 102:13–103:2.

On April 17, 2019, Rossi informed Think Tank that she was resigning, effective May 1, 2019. *See* ECF 116-8 (email from Rossi to Kaur and Bawa). Rossi explained that she could "not sit back and watch [Kaur] maliciously destroy the company any longer[,]" and stated that Kaur was "delusional" to think she could run a company that she had not been meaningfully involved with for the past last 20 years. *Id.* On the same day, April 17, Rossi applied for a job at ITegrity. *See* ECF 116-9 (Pl. Exh. 8). On April 19, 2019, ITegrity offered Rossi the position with a start date of May 2, 2019. *See* ECF 116-10 (Pl. Exh. 9). Rossi accepted. Think Tank alleges that Rossi's employment agreement with it contained "non-compete and confidentiality provisions," SAC ¶ 37, but Rossi disputes that allegation. Ans. ¶ 37.

When Rossi resigned, Bawa gave Rossi the cell phone and laptop that had been issued to her by Think Tank, which contained files and information belonging to Think Tank, including human resources and personnel information and information about prospective employees. SAC ¶ 36; Ans. ¶ 36; Bawa Dep. at 72, 138. Bawa and Kaur never had a conversation about departing

4

employees retaining equipment issued to them by the company, Kaur Dep. at 136:3–8, and Bawa did not make any effort to have Rossi remove Think Tank's information from the laptop he gifted to her, Bawa Dep. at 72.

At some point, Think Tank asked Rossi to return the cell phone and laptop. Rossi Dep. at 154. Rossi declined to do so, indicating that Bawa gifted them to her. *Id.* On June 7, 2019, Think Tank mailed a preservation letter to Rossi. *See* ECF 100-8 (Defs. Exh. F); Rossi Dep. at 311. That letter instructed Ms. Rossi to "take immediate steps to preserve all [electronically store information]" on her personal devices, including the computer and cell phone she received from Think Tank. Defs. Exh. F at 4. Rossi has not returned the computer but has complied with Think Tank's preservation letter to retain all electronically stored information, Rossi Dep. at 311, and has not viewed or used any of the Think Tank information stored on her devices, *id.* at 312. Rossi eventually allowed Bawa to place the Think Tank information stored on the laptop on a thumb drive, which was turned over to Plaintiff in discovery. *Id.* Rossi testifies that she has never shared the Think Tank information on her laptop with anyone at ITegrity, *id.* at 311–12, although Think Tank alleges that Rossi and ITegrity "used and benefitted" from the information, SAC ¶ 43.

Another key Think Tank employee, Proposal Manager Richard Weinstein, resigned in May 2019, *see* Kaur Dep. at 122–23, and Bawa gifted Weinstein his Think Tank-issued laptop. SAC ¶ 50; Ans. ¶ 50; Bawa Dep. at 126. Think Tank has not recovered any of the information that was stored on Mr. Weinstein's laptop. *See* ECF 116 at 12 n.11. Prior to resigning, Weinstein voiced concerns to Bawa about Kaur's lack of experience. Bawa Dep. at 126–27. Weinstein now works for ITegrity as its Senior Director for Proposals. SAC ¶ 58; ECF 100-1 at 12.

Think Tank alleges that, upon Rossi's resignation from Think Tank, Bawa "abdicated his own duties as President and Treasurer of Think Tank," including by "engag[ing] in series of actions

5

to harm Think Tank and benefit ITegrity." ECF 116 at 12. Specifically, Think Tank alleges the

following in its opposition to summary judgment motion:

- In 2019, Bawa caused Think Tank to miss out on an opportunity to be the prime contractor on a contract with NOAA and Mission Information Technology Services ("NMITS").

- Bawa (with Rossi's assistance) interfered with Think Tank's relationship with Redhorse (the prime contract on a subcontract that Think Tank was a subcontractor on) thereby leading to ITegrity negotiating a deal to replace Think Tank with ITegrity as the subcontractor on its project.

- In or around September 2021, ITegrity was awarded a contract by NOAA that was a follow-on award to a contract on which Think Tank had been a subcontractor to Redhorse.

- Bawa had been colluding with ITgerity in securing sole-source 8(a) set-aside contracts for procurements that previously belonged to Think Tank since 2018. He used the same strategy for Think Tank's contracts that ended in 2020 (MARS, AWIPS, RPI contracts) and Redhorse (2021), Think Tank was unable to rebid for these opportunities.

*See* ECF 116 at 10–11.

These allegations are contested. According to Defendants, it became apparent within the

government contracting industry that NOAA intended to direct the AWIPS, RPI, and MARS work

previously held by Think Tank to the 8(a) program—which now ITegrity was part of, and Think

Tank was not—at the end of September 2020. ECF 100-1 at 11 (citing Bawa Dep. at 43:10–20);

*see also* ECF 100-9 (Defs. Exh. G) (July 8, 2020, email from Kaur to Tarandeep asking for support

because many of Think Tank's contracts would be released to the 8(a) program). That meant Think

Tank would not have the opportunity to rebid on these contracts. Defendants further contend that

NOAA awarded ITegrity the AWIPS, RPI, and MARS contracts because it was "already

performing all the work" as Think Tank's subcontractor, "had the capabilities of doing the kind of

work" required, and had done satisfactory work thus far. *Id.* at 12 (citing Tarandeep Dep. at 22:19–21, 24:12–18, 25:11–15).

In July 2021, following NOAA's decision to move the NOAALink task orders to the 8(a) program, Bawa rebid a contract that NOAA awarded to Think Tank years earlier. Bawa Dep. at 31. This contract, which has generally been referred to as the "CBS Finance Contract," is Think Tank's sole remaining contract and is described by Kaur as the company's "bread and butter." Kaur Dep. at 160–61. Bawa also testified that it was around this time he first contemplated going to work for ITegrity. *See* Bawa Dep. at 29:19–30:11. Bawa ultimately started working full time for ITegrity in August 2021. *See* ECF 101-at 13 (citing Bawa Dep. at 29:19–30:4, 105:8–107:1); ECF 100-6 (Bawa Aff. ¶ 6). In November 2021, the laptop Bawa used was "dying," so he bought himself a new one. Bawa Dep. at 65. He was terminated before being reimbursed for this expense. *Id.*

On December 31, 2021, Think Tank removed Bawa as an officer and terminated his employment. SAC ¶ 59; Ans. ¶ 59. The next day, on January 1, 2022, Think Tank provided Bawa with a written notice of termination, which instructed Bawa to return all company property in his possession, including any login and online account information, and not to access any company accounts without consent of Think Tank's CEO. SAC ¶¶ 61–62; Ans. ¶¶ 61–62.

During his tenure as President of Think Tank, Bawa set up Think Tank's email system and had "super admin" credentials. Bawa Dep. at 61:17–62:16, 66:8–22. At the time of Bawa's termination, Think Tank's email system was being hosted by Rackspace.[2] *Id.* at 66. Bawa still had access to his Rackspace account after Think Tank terminated him. *Id.* Bawa admits to logging on to his super admin account "a number of times" after he was terminated, *id.* at 142:13–19; *see also*

---

[2] Rackspace is a cloud computing services provider. *See* SAC ¶ 65.

Kaur Dep. at 178–79, but he denies ever forwarding or copying emails sent to Ms. Kaur's Think Tank email address. Bawa Dep. at 143:2–6.

Sometime in the first quarter of 2022, one of Think Tank's business partners contacted Ms. Kaur to alert her that it "look[ed] like [her] email [was] being forwarded" to a Gmail account (the "Forwarding Gmail Account"). Kaur Dep. at 173:13–19, 174:1–3; *see also* ECF 100-1 at 13. Ms. Kaur contacted Rackspace for an explanation. *Id.* at 172–74. Rackspace explained that Kaur's Think Tank email address had forwarding setup to the Forwarding Gmail Account. *See* ECF 116-19 (Pl. Exh. 18). Kaur stated that she never set up that automatic forwarding rule. *Id.* Rackspace then informed Kaur that "Harinder [Bawa] is still the super admin." *Id.* Bawa denies any affiliation with the account Forwarding Gmail Account. *See* ECF 100-12 (Bawa Resp. to Req. for Admis.) Nos. 18, 19, 20, & 21.

## III.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Federal Rule of Civil Procedure 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (emphasis omitted); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

8

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249. "Where the party opposing summary judgment fails to respond to a summary judgment motion with evidence demonstrating the existence of a genuine dispute of material fact, summary judgment is appropriate." *Orso v. Disner*, No. 3:14-CV-91, 2020 WL 370204, at *1 (W.D.N.C. Jan. 9, 2020) (citing *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

## IV.    DISCUSSION

### A.  Count I – Breach of Fiduciary Duties

In Count I of the SAC, Plaintiff asserts a claim for breach of fiduciary duty against Bawa. Think Tank argues each of the following acts or omissions constitutes a breach of Bawa's fiduciary duties: (i) "gifting" Think Tank laptop devices containing sensitive company information to Weinstein and Rossi, who Bawa knew was leaving Think Tank to work for its competitor, ITegrity; (ii) causing Think Tank to miss out on contracts with NOAA and Mission Information Technology Services NMITS; (iii) interfering in Think Tank's relationship with Redhorse (Think Tank's partner on a contract) and negotiating a deal between Redhorse and ITegrity, resulting in Redhorse replacing Think Tank with ITegrity on the contract; (iv) leveraging his relationships with NOAA to divert 8(a) set-aside contracts that previously belonged to Thank Tank to ITegrity; and (v) using superuser administrative privileges to access Think Tank's email system, while working for ITegrity, to intercept, retrieve and forward Think Tank emails to himself containing the company's proposals, financial information, contracts, and HR information. *See* ECF 116 at 17–18.

To establish a breach of fiduciary duty as an independent cause of action under Maryland law, a plaintiff must show: "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." *Plank v. Cherneski*, 231 A.3d 436, 442 (Md. 2020); *see also Sirius Fed., LLC v. Jelen*, Civ. No. LKG-22-00223, 2023 WL 2213929, at *11 (D. Md. Feb. 24, 2023). The remedy for a breach depends on the type of fiduciary relationship. "If a plaintiff describes a fiduciary relationship, identifies a breach, and requests a remedy historically recognized by statute, contract, or common law applicable to the specific type of fiduciary relationship and the specific breach is alleged, a court should permit the count to proceed." *Plank*, 231 A.3d at 466.

"Under Maryland law, every employment contract contains an 'implied duty [of loyalty:] that an employee act solely for the benefit of his employer in all matters within the scope of employment.'" *Philips N. Am. LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *13 (D. Md. Sept. 9, 2020) (quoting *Maryland Metals Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)). "In line with this duty, an employee is required to 'act solely for the benefit of his employer in all matters within the scope of employment' and to refrain from 'actively competing with his employer during the tenure of his employment.'" *Allegis Grp., Inc. v. Nosky*, Civ. No. PX-22-01516, 2024 WL 1282831, at *6 (D. Md. Mar. 26, 2024), *aff'd sub nom. Aerotek, Inc. v. Nosky*, No. 24-1372, 2025 WL 2141297 (4th Cir. July 29, 2025) (quoting *Maryland Metals*, 382 A.2d at 568). Accordingly, a breach of loyalty may be supported in various ways, including where a former employee "solicits an employer's major customers on behalf of a competitor; entices fellow employees from the company; usurps major business assets; or commits other 'patently wrongful acts in derogation of the trust and confidence reposed in them by the complaining employer[ ].'" *Id.* (quoting *Maryland Metals*, 382 A.2d at. at 571–72).

An employee may also be liable for a breach of fiduciary duty if he or she commits a "fraudulent, unfair, or otherwise wrongful act such as misappropriation of trade secrets, conspiracy to bring about mass resignation of key employees or interference with an employer's business opportunities." *EndoSurg Medical, Inc. v. EndoMaster, Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014) (citing *Maryland Metals, Inc.*, 382 A.2d at 568–69). "The misuse of confidential information" can also constitute a breach of fiduciary duty. *Fundamental Admin. Servs., LLC v. Anderson*, Civ. No. JKB-13-1708, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014) (citation omitted).

Bawa, as a corporate officer and employee, undoubtedly had a fiduciary relationship with Think Tank. He admits that corporate officers in Maryland owe their employer certain duties, such as loyalty and care. *See* ECF 100-1 at 10. However, as explained below, Bawa is entitled to summary judgment on all of Think Tank's breach-of-fiduciary-duty claims except for the claim that Bawa breached his duty of loyalty by directing business to ITegrity. A genuine dispute exists about Bawa's relationship with ITegrity while he was still employed by Think Tank.

### 1. Gifting laptops

Think Tank cannot establish that Bawa breached a fiduciary duty by permitting Rossi and Weinstein to retain their Think Tank-issued laptops because there is no evidence of resulting harm. To begin, it is unclear whether the laptops contained "confidential and proprietary" information, as Think Tank asserts in its opposition. *See* ECF 116-1 at 1, 5–10, 12, 15. Although Think Tank claims that Rossi's laptop contained materials such as offer letters, resumes, and job descriptions, it does not identify any specific documents in the record. *See id.* at 8–9. Even assuming such materials were present and that Bawa knew of them, Think Tank offers no evidence that their retention by its former employees caused any harm. *See Plank*, 231 A.3d at 442 (proving "harm to

the beneficiary" is a necessary element of to establish a breach of fidiciuary duty); *Jelen*, 2023 WL 2213929, at *11 (same). The uncontroverted testimony is that Rossi has done "nothing" with the information other than comply with Think Tank's preservation letter and discovery; she testified that she has never shared it with anyone, including ITegrity. *See* Rossi Dep. 311:17–312:10.

Think Tank's assertion that Rossi used confidential information "to aid ITegrity in taking Think Tank's federal contracts" is unsupported. ECF 116 at 11. Think Tank first cites a May 9, 2019, email from Rossi's Gmail account with the subject line "Offer Letters," which appears to include attachments. *See* ECF 116-12 (Pl. Exh. 11). But Think Tank does not explain the origin of those documents, identify their recipients, or show how they relate to ITegrity obtaining Think Tank's contracts. Next, Think Tank cites a portion of Bawa's deposition that similarly fails to bridge the gap between confidential information on the computers and harm to Think Tank. *See* ECF 116 at 11 (citing Bawa Dep. 47:18–49:4). His testimony reflects only that, at ITegrity's request, he provided a past-performance reference based on ITegrity's prior work as a subcontractor—standard information unrelated to any alleged misuse of confidential materials. *See* Bawa Dep. 47:3–49:4.

The same deficiency applies to Weinstein's laptop. Think Tank asserts that the device has not been returned and that it has been unable to recover any information stored on it. ECF 116-1 at 10 n.1. It offers no evidence that any such information was accessed, used, or disclosed, much less that it caused harm.

In sum, Think Tank's claim fails for lack of evidence of harm. At most, it alleges that confidential information may have existed and could have been misused. But such speculation is insufficient to survive a summary judgment motion.

## 2. NMITS contract

The record does not support Think Tank's claim that Bawa caused it to miss out on contracts with NOAA and Mission Information Technology Services (NMITS). As support, Think Tank cites the following portion of Bawa's deposition:

> Q: It says in the next sentence: Recall other opportunities such as NOAA Mission Information Technology Services that Think Tank elected to pursue by teaming with other Government contractors. What other government contractors is that referring to?
>
> A: So that was NMITS. So that was what we were talking about earlier, Red Horse and ITegrity and I don't remember the fourth, there were four companies total on that one with Think Tank. So –
>
> Q: That was the one that –
>
> A: That we lost.
>
> Q: That you lost?
>
> A: We bid NMITS – yeah, we did team with them but we lost.
>
> Q: Did Red Horse eventually win that contract?

ECF 116 at 17 (citing Bawa Dep. 111:4–22). In the next line of the deposition, which Defendants cite in their reply, Bawa testifies:

> A: No, that – so we formed what was called a CTA, which is a contracting teaming arrangement or something, basically it's just a bunch of companies teaming together and it was Red Horse and ITegrity and Think Tank and one other company, so we bid it as one and we lost. So no, Red Horse – we all lost.

ECF 118 at 7 (citing ECF 118-1 (Bawa. Dep.) 112:1–112:7).

Bawa's testimony is that, while he was its President, Think Tank pursued NMITS, but the company was unsuccessful in obtaining the contract. Think Tank does not cite any fiduciary duty Bawa breached in losing the bid. Without more, Bawa could not have violated a fiduciary duty simply by unsuccessfully bidding on a contract. Think Tank does not point to evidence or authority suggesting otherwise. Summary judgment in favor of Bawa on this claim is appropriate.

13

### 3. Interfering in Think Tank's relationship with Redhorse

Think Tank argues that Bawa breached a fiduciary duty by interfering with its relationship with Redhorse and negotiating a deal between Redhorse and ITegrity, resulting in Redhorse replacing Think Tank with ITegrity on a contract. The record offers no support for this claim.

Think Tank attaches to its opposition a brief an email exchange from April 2019 between Bawa, Tarandeep, Rossi, and employees of Redhorse. ECF 116-13 at 2. This exchange occurred before Rossi's departure from Think Tank. In the exchange, Rossi introduces Tarandeep and employees from Redhorse to each other. *Id.* at 2. The Redhorse employees tell Tarandeep that they "love working with Think Tank and are excited about a partnership with [ITegrity]." *Id.*

A later email exchange from July 2019, also attached to the opposition, suggests that Think Tank, ITegrity, and Redhorse are all working together on a proposal document. *Id.* at 4. The email exchange is between Jon Johnson, Director of Redhorse, and Bawa, who was still with Think Tank at the time. *Id.* Rossi was employed with ITegrity by this point and is included on the email exchange, as well as Tarandeep. *Id.* Bawa explained the email exchange as follows:

> Q: I'm showing you what I've had marked as Exhibit 5, let me know if you recognize this email.
>
> A: I remember the context. I don't remember this exact email, but –
>
> Q: What's the relationship between Think Tank and Red Horse?
>
> A: I don't know that there is one right now.
>
> Q: Was there ever?
>
> A: Yeah. Yes, there was.
>
> Q: What was the relationship?
>
> A: We were – we were trying to team on another vehicle, the follow-on to NOAALink. Which is called NMITS, N-M-I-T-S.
>
> Q: Okay. Red Horse and Think Tank were trying to?

A: Well, it was more than that. I think there were actually four companies in total.

Q: Was ITegrity one of them?

A: Yes.

Q: It says: Good morning, Michelle, Tarandeep, and Harinder, before I send this over to Think Tank, I wanted to bounce this off you first. Why is he – why is Mr. Johnson bouncing this off of the three of you before sending –

A: It sounds like a question for him. I can't – I don't know.

Q: What was your relationship like with Mr. Johnson?

A: I don't even remember Jon Johnson.

Q: And you then forwarded this – well, you respond to this e-mail and you copy Michelle and Tarandeep at their ITegrity e-mail addresses. Do you see that?

A: It looks like I probably did a reply all.

Q: Okay. You do this from your Think Tank e-mail, right?

A: Yeah.

Q: Why did you not – well, let me ask it this way. Why didn't Think Tank end up partnering with Red Horse for this contract?

A: They did.

Q: Is it presently partnered with Red Horse?

A: They didn't win.

Q: But ITegrity and Red Horse eventually did.

A: No, they didn't – they did not win a NMITS award.

Q: ITegrity didn't win any NMITS awards?

A: Correct.

Q: Were you trying, in this e-mail, to steer this business away from Think Tank to ITegrity?

15

A: No. Let me read it. No, this is talking about a meatball chart in a proposal, which is typically where you – where you're listing qualifications like you have skills in this area and this area and this area, and these are your requirements and this is where we've done it on these contracts and we're talking about space and where to put it. And I mean, it has nothing to do with that. I actually –

Q: This is a time when you know your divorce is about to be finalized, right?

A: Oh, yeah.

Q: And you know that Ms. Kaur is taking over the business, right?

A: Uh-huh.

Q: And you don't copy her on this e-mail?

A: Like I said, it looks like I did a reply all. I just replied all to the e-mail.

Q: You're getting information in this e-mail about business that could come to Think Tank through partnership with Red Horse and you don't let Ms. Kaur know anything about it?

A: That's not correct. Its –

Q: How did you let her know about it?

A: No, I don't know that I did let her know about it. I don't know that it affected her. This was just asking about – it's a proposal question asking about how we're going to fill out a meatball chart and so I replied. I mean I actually got Think Tank on this team. Think Tank wasn't in a position to prime so they needed to be on a team. I made sure that it got on a team that I thought was very strong. Red Horse already had – this is a NOAA contract. Red Horse already had NOAA work, ITegrity had NOAA work, and I said with those three companies and then the fourth one, and I don't remember what they were called, we would have been a very strong team.

Bawa Dep. at 73:12–77:14.

This record does not suggest that Bawa interfered with Think Tank's relationship with Redhorse or negotiated a deal between Redhorse and ITegrity to Think Tank's disadvantage. Instead, the uncontradicted evidence is that Think Tank, ITegrity, and Redhorse bid unsuccessfully

on a contract together. Think Tank does not point to any evidence in the record that Redhorse replaced Think Tank with ITegrity on a contract, nor evidence that Bawa otherwise "interfered" with Think Tank's relationship with Redhorse. The only evidence Think Tank points to is one email showing Redhorse "love[s] working" with Think Tank and another showing that the companies, along with ITegrity, were working together on a proposal. Think Tank has failed to present any genuine dispute of material fact in support of a breach-of-fiduciary-duty claim based on any alleged interference Bawa conducted between Think Tank and Redhorse. Thus, Bawa is entitled to summary judgment on this claim.

### 4. Diverting business to ITegrity

Bawa is not entitled to summary judgment regarding Think Tank's claim that he breached a fiduciary duty by diverting contracts to ITegrity. A corporate officer's duty of loyalty requires there to be "no conflict between duty and self-interest." *Weaver v. ZeniMax Media, Inc.*, 923 A.2d 1032, 1054 (Md. App. Ct. 2007) (quoting *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 751 (Del. Ch. 2005)). Prior to termination, "an employee may not solicit for himself business which his position requires him to obtain for his employer. He must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer." *Maryland Metals*, 382 A.2d at 568.

Think Tank highlights the following evidence. At some point, Bawa believed Think Tank was at risk of losing NOAALink work because NOAA intended to reclassify the existing contract from "small business" to "full and open," which would allow larger companies (with which Think Tank likely could not compete) to bid. Bawa Dep. at 86:12–19. To prevent that, Bawa encouraged the client to convert the work to an 8(a) contract, rather than full and open, and specifically to consider ITegrity, who had 8(a) status at the time. *Id.* at 87–88. Bawa claims his idea was that if

17

ITegrity was awarded the contract, then Think Tank could sub-contract with ITegrity and therefore retain some of its previous work. *See id.* at 87, 89.

The results of Bawa's efforts are not clear from the record. Bawa testified that, with respect to the specific instance discussed above, the contract was converted to full and open, and a larger company won the contract. *Id.* at 89:15–17. However, Defendants' reply brief represents as an "undisputed, material fact that NOAA moved all of the NOAALink work to SBA's 8(a) program," ECF 118 at 9, and Bawa testified that for all the 8(a) work that ITegrity did win, Think Tank never subcontracted for any of that work, Bawa Dep. at 89:21. The record also indicates that Tarandeep may have initiated conversations with NOAA about awarding ITegrity 8(a) sole source contracts, *see* ECF 116-14 & ECF 116-15 (emails between Tarandeep and NOAA), and that ITegrity ultimately received work—including the RPI contract that had previously belonged to Think Tank—even though it did "nothing" to win that the contract. *See* ECF 116-4 (Tarandeep Dep.) at 22:19–23:19. It is also clear from the record that Bawa had a both professional and personal relationship with his cousin, Tarandeep, and began working for ITegrity full time before he was terminated from Think Tank. This record is consistent with Think Tank's contention that Bawa, while serving as Think Tank's President, effectively diverted NOAA work to ITegrity, to Think Tank's detriment.

Bawa denies that, while serving as Think Tank's President, he contemplated future employment at ITegrity working on the same contracts. Bawa Dep. at 89:4–17. That may well be true. *But see* Bawa Dep. at 29:19–30:11 (Bawa explaining that he first thought about working for ITegrity in July 2021). It may also be true that he encouraged agencies to steer work to ITegrity through the 8(a) program because he believed that path offered Think Tank the best chance of

retaining some portion of the work. But reaching either conclusion requires a determination of Bawa's credibility, an exercise that is forbidden at the summary judgment stage.

Viewing the facts supported by the record in the light most favorable to the Think Tank, genuine disputes exist as to whether Bawa breached fiduciary duties by failing to act "solely for the benefit of his employer in all matters within the scope of employment" and by improperly interfering with Think Tank's business opportunities, and whether Think Tank was harmed as a result. *Hayes*, 2020 WL 5407796, at *13. As President, Bawa was obligated to avoid conflicts between his duties to Think Tank and his personal interests. Yet the record permits a view that Bawa encouraged NOAA to convert NOAALink work to the SBA's 8(a) program and to consider ITegrity—a company owned by his cousin and for which he would soon work—for that work. Bawa Dep. 86:12–19, 87–88. Although Bawa asserts this strategy was intended to preserve subcontracting opportunities for Think Tank, the following record evidence permits a contrary inference from the following: ITegrity ultimately received 8(a) work previously belonging to Think Tank and other contracts that Tarandeep testified ITgeirty did "nothing" to obtain; Bawa had a both professional and personal relationship with his cousin and began working for ITegrity while still President of Think Tank; and Think Tank did not receive any subcontracting work as a result. Bawa Dep. at 29:19–30:11, 89:21; Tarandeep at 22:19–23:19. Taken together, a jury could find that Bawa engaged in conduct akin to "interference with an employer's business opportunities" or other "patently wrongful acts in derogation of the trust" owed to Think Tank. *EndoSurg Med.*, 71 F. Supp. 3d at 556; *see also Maryland Metals*, 382 A.2d at 571–72. Finally, a reasonable jury could find that Plaintiff was harmed by Bawa's conduct, insofar as the record reflects that Think Tank lost work it previously performed and did not retain any portion of that

work through subcontracting. Because the foregoing facts support competing inferences as to Bawa's intent and the effect of his conduct, summary judgment is inappropriate.

### 5. Accessing Think Tank's email

Bawa admits that he accessed Think Tank's email system during the first quarter of 2022, *after* Think Tank fired him on or around January 1, 2022. ECF 118 at 10. However, he argues that Think Tank fails to provide "any support for the notion that post-termination conduct can establish a breach of fiduciary duty claim." *Id.*

"[C]ertain fiduciary duties may persist beyond the termination of an employer-employee relationship." *C&R Caulking v. Bank of Am., N.A.*, Civ. No. JKB-21-0499, 2021 WL 2661875, at *7 (D. Md. June 29, 2021) (citing *Operations Rsch., Inc. v. Davidson & Talbird, Inc.*, 217 A.2d 375, 385 (Md. 1966) (finding an ongoing duty not to misappropriate trade secrets)); *see also Maryland Metals*, 382 A.2d at 568 ("Once the employment relationship comes to an end, of course, the employee is at liberty to solicit his former employer's business and employees, subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential information."). But the duty Think Tank identified in its pleading, the duty of loyalty, SAC ¶ 94, generally does not. *See C&R Caulking*, 2021 WL 2661875, at *7 (holding that "the duties of loyalty" do not exist beyond the termination of the employment relationship (citing *Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 400 (Md. 2011) ("[T]he duty of loyalty ... requires that an employee act solely for the benefit of his employer in all matters *within the scope of employment*."))) (emphasis added in *C&R Caulking*). Therefore, the Court finds as a matter of law that Bawa did not breach a fiduciary duty owed to Think Tank in accessing its email system after his termination. Even if Bawa's access to the email system constituted a breach of a duty, Think Tank has presented no evidence that it was harmed by this conduct. *See Plank*, 231 A.3d at 442.

Accordingly, Bawa is entitled to summary judgment on Think Tank's claim that he breached a fiduciary duty by accessing Think Tank's emails.

***

In sum, summary judgment is granted in Bawa's favor on Count I except for Plaintiff's claim that Bawa violated a duty of loyalty by directing business to ITegrity, which shall proceed to trial.

### B. Count IV – Aiding and Abetting Breach of Fiduciary Duty

In Count IV of the SAC, Think Tank claims that ITegrity aided and abetted Bawa's breach of fiduciary duty under Maryland law.

A prerequisite to aiding and abetting liability is an underlying violation of a fiduciary duty. *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1050 (Md. 1995). Additionally, aiding and abetting requires the complainant to prove that the defendant "knowingly and substantially assist[ed] the principal violation." *Sutton v. FedFirst Fin. Corp.*, 126 A.3d 765, 792 (Md. App. Ct. 2015); *see also Saadeh v. Saadeh, Inc.*, 819 A.2d 1158, 1171 (Md. App. Ct. 2003) ("To be liable in tort, the aider or abettor must have engaged in assistive conduct that he would know would contribute to the happening of that act.").

Here, Think Tank has presented a triable breach-of-fiduciary-duty claim only with respect to Bawa's alleged diversion of business from Think Tank to ITegrity. Then, the only question presented in Count IV is whether there is enough evidence in the record that ITegrity knowingly assisted in Bawa's alleged breach to create an issue for trial.

Think Tank does not point to any evidence that ITegrity knowingly assisted Bawa's alleged breach of fiduciary duty. Think Tank contends that it is "beyond a mere coincidence" that Bawa ended up employed by his cousin, Tarandeep, at ITegrity, which now held the NOAA contract that

21

previously belonged to Think Tank. ECF 116 at 23. Those facts are undisputed. But Think Tank fails to identify any evidence that ITegrity solicited, encouraged, or otherwise "assisted" Bawa—as opposed to solely being the beneficiary of Bawa's alleged breach. "Trial courts in the Fourth Circuit have an 'affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Philadelphia Indem. Ins. Co. v. Markel Ins. Co.*, 649 F. Supp. 3d 84, 93 (D. Md. 2023) (quoting *Bouchat*, 346 F.3d at 526). Here, Think Tank's aiding and abetting claim is supported only by "mere speculation" and a "compilation of inferences," which is insufficient to avoid summary judgment. *Id.* (quoting *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001). Accordingly, ITegrity is entitled to summary judgment on Count IV.

### C. Counts II and XIII – State and Federal Misappropriation of Trade Secrets

In Counts II and XIII of the SAC, Think Tank asserts claims against all Defendants for misappropriation of trade secrets. Think Tank argues that the files on the laptop computers Rossi and Bawa retained after their employment ended were trade secrets that these Defendants misappropriated. Think Tank contends that the files were trade secrets because they were "confidential and proprietary business" files including (i) offer letters, performance reviews, and raise justifications; (ii) resumes and job descriptions for openings; (iii) labor categories and rate structures for employees who provided services under the company's government contracts; (iv) security clearance documentation for Think Tank employees; and (v) contract assignments for Think Tank employees. *See* ECF 116 at 19. According to Think Tank, evidence in the record "establishes that Defendants misappropriated Think Tank's trade secrets when Defendants Rossi and Bawa refused to return their Think Tank devices upon the termination of their employment with the company," and Think Tank is not required to prove the trade secret was acquired via

22

"improper means" so long as "there is potential economic value to others in the information the plaintiff seeks to protect." *Id.* at 20.

Defendants argue that Think Tank's trade secret misappropriation claims fail as a matter of law because it has not established that the files on the laptop that Bawa gifted Rossi upon her resignation constitute trade secrets and, further, because Rossi did not obtain the files through improper means. First, Defendants argue that the files on Rossi's laptop largely related to Think Tank's human resources and did not have any "independent economic value." ECF 100-1 at 17. Second, Defendants contend that Rossi did not obtain these files through improper means; rather, she was gifted the computer and has since done nothing with the files except preserve them pursuant to Think Tank's preservation letter. *Id.* at 18.

Think Tank brings its trade secret misappropriation claims under Maryland's Uniform Trade Secrets Act ("MUTSA") and the federal Defend Trade Secrets Act ("DTSA"). "To establish misappropriation of a trade secret under federal law and Maryland state law, [the plaintiff] must demonstrate that the documents at issue are trade secrets, and that Defendants misappropriated those trade secrets." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 435 (D. Md. 2024) (quoting *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020)). The MUTSA and DTSA define "trade secrets" similarly to include all types of financial, business, technical, economic, or engineering information, that: (1) the owner took "reasonable" steps to keep the information secret, and (2) the information derives "independent economic value" from not being generally known or readily ascertainable by potential competitors. *See* Md. Code Ann., Com. Law § 11-1201(e); 18 U.S.C. § 1839(3). "The definitions of misappropriation in federal and state law also mirror each other. A person misappropriates trade secrets when they (1) acquire a trade secret that they know or have reason to know was acquired by improper means, or (2) use or disclose the

trade secret after acquiring it through improper means." *ClearOne Advantage*, 710 F. Supp. 3d at 435 (citations omitted).

Even assuming, *arguendo*, that the files on Rossi's and Bawa's computers were trade secrets, Think Tank's claims must fail because there is no evidence to suggest that Defendants misappropriated that information. The MUTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Md. Code Ann., Com. Law § 11-1201(b). "[F]rom this list, one can derive some common characteristics of improper means[:] All of the examples listed in the MUTSA constitute intentional conduct involving some sort of stealth, deception or trickery." *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001). The DTSA includes the same definition as the MUTSA and adds that the term "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

First, there is no evidence in the record that any Defendant used any information stored on either Rossi's or Bawa's laptops. For her part, Rossi testified that she never viewed or otherwise used Think Tank information stored on her laptop; she has only preserved it. Rossi Dep. at 311–12.

Second, there is no record evidence the information stored on the laptops was acquired from Think Tank by any improper means. Bawa, then-President of Think Tank, gifted Rossi her laptop shortly after she resigned in recognition of her service to Think Tank. *See* Rossi Dep. at 23. There is no evidence that Rossi acquired the laptop or the information stored on it through improper means.

As for Bawa's computer, the only evidence in the record is Bawa's deposition statements that he personally bought the computer and was never reimbursed. *See* Bawa Dep. at 65:1-8 ("Actually, that's a funny story. My laptop was dying and I bought a new one, so I was fired in I guess December 31st, I bought a new one in November just before, and then Think Tank never paid me for it so my laptop was mine. I was using it as a personal laptop."). Think Tank offers nothing to rebut Bawa's testimony. Although it repeatedly calls Bawa's computer "Think Tank-issued," *see, e.g.*, ECF 116 at 15, Think Tank does not support its assertion with any receipt, payment, policy, or other record demonstrating its right to the property. Moreover, Think Tank identifies no evidence in the record as to what information was stored on Bawa's laptop. In sum, there is no evidence that Bawa obtained any trade secret belonging to Think Tank at all, much less through any improper means.

Plaintiff is incorrect to suggest that it "not required to show improper means and use, so long as there is potential economic value to others in the information the plaintiff seeks to protect." ECF 116 at 20. The only authority Plaintiff cites is *Optic Graphics, Inc. v. Agee*, 591 A.2d 578 (Md. Ct. Spec. App. 1990), but that case does not support Plaintiff's assertion. There, the Appellate Court of Maryland affirmed a trial court's determination that pricing information and a marketing strategy plan belonging to a graphic arts company did not constitute trade secrets. *Id.* at 785. The court did not reach the question of whether the graphics art company's information was or was not "misappropriated" at all because it already concluded that the information did not constitute a trade secret. *Id.* Accordingly, *Optic Graphics* does not relieve Plaintiff of its burden of showing that Defendants either acquired Plaintiff's trade secrets knowing they had been acquired by improper means, or they used or disclosed Plaintiff's trade secrets after acquiring them through improper

means. *ClearOne Advantage*, 710 F. Supp. 3d at 435. Plaintiff cannot meet this burden. Defendants are entitled to summary judgment on Counts II and XIII.

### D. Count III – Conversion

In Count III of the SAC, Plaintiff asserts claims for conversion against Bawa and Rossi under Maryland law based on the same conduct underlying its trade secret misappropriation claims: these Defendants' retention of laptops they used while working for Think Tank.

"Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). "The physical act can be summarized as 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Borzym*, 841 A.2d at 835 (quoting *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 963 (Md. 1999)). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* "At a minimum, a defendant liable for conversion must have 'an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" *Borzym*, 841 A.2d at 836 (quoting *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985)). Thus, the plaintiff asserting conversion must show "(1) plaintiff's right to possess the property; and (2) defendant's intentional taking of the property without authorization or permission." *Vongohren v. Citimortgage, Inc.*, Civ. No. JFM-14-3549, 2016 WL 739070, at *6 (D. Md. Feb. 25, 2016) (citations omitted). Conversion requires "the unauthorized dominion and control to the complete exclusion of the rightful possessor." *Messing v. Bank of Am., N.A.*, 821 A.2d 22, 35 (Md. 2003) (citation omitted).

Think Tank contends that Rossi and Bawa's refusal to return the computers containing Think Tank's information as requested is sufficient survive summary judgment. *See* ECF 116 at 22.[3]

Defendants are entitled to summary judgment. First, Rossi received her computer as a gift from Think Tank through its then-President, Bawa. Thus, the dominion and control she exercised over the laptop to the exclusion of Think Tank was not unauthorized. Plaintiff cannot establish a right to possess property it gifted Rossi. Rossi was the laptop's rightful possessor. Second, Bawa purchased his computer with his own funds. Plaintiff fails to identify any evidence in the record to call the foregoing facts into dispute or to show that either Rossi or Bawa had any intent to exercise dominion or control over the computers in any way inconsistent with Think Tank's rights. Thus, Plaintiff's conversion claims fail as a matter of law, and Defendants are entitled to summary judgment on Count III.

### E.  Count V – Breach of Contract

In Count V of the SAC, Plaintiff asserts a claim against Rossi for breach of her employment contract. Rossi argues that she never had an employment contract with Think Tank. *See* ECF 100-1 at 28. She contends that Think Tank's breach-of-contract claim must fail because "her employment with ITegrity is not and never has been precluded by any sort of restrictive covenant." *Id.* In opposition, Plaintiff does not address its breach of contract claim or respond to Rossi's arguments, nor does it identify any evidence that Rossi had an employment contract with Think Tank. "A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim." *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448–49 (D. Md. 2022) (citing

---

[3] Plaintiff also argues that Bawa's use of superuser administrative rights "to login to Think Tank's email accounts and set up rules to automatically forward Think Tank emails to himself" supports its conversion claim but does not explain how.

*Ferdinand-Davenport v. Child.'s Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010). Here, Plaintiff failed respond to Rossi's argument that she could not have breached any contract with Think Tank because no express contract exists between the two. Plaintiff has thus abandoned its breach-of-contract claim. Moreover, "[t]o prevail in an action for breach of contract [under Maryland law], a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *S. River Cap., LLC v. Manufacturers & Traders Tr. Co.*, Civ. No. RDB-23-2371, 2025 WL 3012890, at *9 (D. Md. Oct. 28, 2025) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). In the instant case, Plaintiff has identified no evidence of any contractual obligation Rossi owed Think Tank. Rossi is entitled to summary judgment on Count V.

### F. Count VI – Conspiracy

In Count VI of the SAC, Plaintiff asserts a claim of civil conspiracy under Maryland law against all Defendants. A claim for civil conspiracy requires: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damage resulting to the plaintiff." *Lilly v. Balt. Police Dep't*, 694 F. Supp. 3d 569, 592 (D. Md. 2023) (citing *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007)). To prove civil conspiracy, Plaintiff must show the "commission of an overt act, in furtherance of the agreement, that caused [it] to suffer actual injury." *Aarow Elec. Sols. v. Tricore Sys.*, LLC, 693 F. Supp. 3d 525, 542 (D. Md. 2023). Civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Kramer v. Mayor & City Council of Balt.*, 723 A.2d 529, 542 (Md. 1999) (quoting *Alleco*, 665 A.2d 1038). Here, Plaintiff asserts that Defendants "confederated and entered into an unlawful agreement and

undertaking" to misappropriate trade secrets and for Bawa to breach his fiduciary duties. SAC ¶¶ 165-170. Accordingly, Plaintiff must establish a misappropriation of trade secrets and/or breached of Bawa's fiduciary duties to Think Tank.

Plaintiff's conspiracy claim fails as a matter of law. First, as explained in Part IV.C, Plaintiffs fail to present any evidence its trade secrets were misappropriated by any Defendant. Second, although as explained in Part IV.A.4. Plaintiff has presented adequate evidence to create a genuine dispute as to whether Bawa breached a fiduciary duty in diverting business from Think Tank to ITegrity, Plaintiff has identifies no evidence that ITegrity or anyone else entered any agreement with Bawa to breach his fiduciary duty or committed any act in furtherance of any such agreement. In its opposition brief, Plaintiff simply states that "[t]he factual predicate set forth by Think Tank in support of its opposition to the dismissal of its aiding and abetting claim (Count IV) also satisfies the elements for conspiracy. Therefore, summary judgment on Count VI should be denied." ECF 116 at 24. To the contrary, Plaintiff's aiding-and-abetting claim in Count VI fails for the reasons explained in Part IV.B. Its conspiracy claim fares no better. Accordingly, Defendants are entitled to summary judgment on Count VI.

### G. Counts VII and VIII – State and Federal Wiretap Act

In Counts VII and VIII, Plaintiff claims Bawa and ITegrity violated federal and Maryland wiretap laws. SAC ¶¶ 171–181. Defendants argue that the federal and state wiretap statutes each require that the alleged wrongdoer "intercept the electronic communication contemporaneously with its transmission by the sender." ECF 100-1 at 29 (citations omitted). Because Plaintiff's wiretap claims here are based on the allegation that Bawa viewed certain of emails after he was terminated in January 2022, Defendants argue, Bawa did not "contemporaneously" intercept a message and thus Bawa and ITegrity are entitled to summary judgment in their favor as to Counts

VII and VIII. *Id.* at 29–30. Plaintiff asserts that Bawa contemporaneously intercepted Think Tank's electronic communications when he accessed its email systems without authorization. ECF 116 at 25. More specifically, Plaintiff contends that Bawa logged into Think Tank's email systems 16 times after he was terminated, and "acquired and intercepted Think Tank's email communications by using the company's SuperAdmin login credentials to not only access Ms. Kaur's email, but to set up rules so that certain emails would be automatically forwarded to a Gmail address that he used for this very purpose." *Id.*

Under the federal statute, 18 U.S.C. §§ 2510–11, liability attaches when an electronic communication is "intercepted." Maryland's wiretap statute, Md. Code Ann., Cts. & Jud. Proc. § 10-401–02, similarly makes it unlawful to "[w]illfully intercept" electronic communications. These statutes share similar provisions, and Maryland courts have construed them consistently with each other. *See Diebler v. State*, 776 A.2d 657, 663 (Md. 2001) ("[T]he Maryland wiretap law… generally 'is modeled upon the federal act . . . and extensively tracks its provisions.'") (quoting *Wood v. State*, 431 A.2d 93, 95 (Md. 1981)). Both statutes define "intercept" identically as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *See* 18 U.S.C. § 2511(4); Md. Code Ann., Cts. & Jud. Proc. § 10-401(10). Courts interpreting the federal wiretap statute have held that that an interception must occur "contemporaneously" with the communication's transmission. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877–88 (9th Cir. 2002) (holding that interception requires acquisition "during transmission, not while it is in electronic storage."); *Glob. Pol'y Partners, LLC v. Yessin*, 686 F. Supp. 2d 631, 634, 638–39 (E.D. Va. 2009) (holding that allegations that the defendant accessed his his estranged wife's work email using her password failed to state a Wiretap Act claim he accessed the messages only after they were already stored

on a server); *Jones v. Twitter, Inc.*, Civ. No. RDB-20-1963, 2020 WL 6263412, at \*4 (D. Md. Oct. 23, 2020) (citing *Konop* and *Yessin*).

In *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010), an IRS employee secretly created a Microsoft Outlook "rule" on his supervisor's account that automatically forwarded every e-mail she received to his own inbox. When the supervisor discovered the rule, the employee was prosecuted and convicted under the Wiretap Act, 18 U.S.C. § 2511(1)(a). On appeal, the Seventh Circuit affirmed his conviction, holding that the auto-forwarding constituted an "interception" of electronic communications. The court rejected the argument that no interception occurred because the copies were sent after delivery to the supervisor's inbox; instead, it found that the employer's mail server duplicated each message and delivered a copy to the defendant at the same moment (or within the same second) as it delivered the original to the supervisor. *Szymuszkiewicz*, 622 F.3d at 703–06.

There is record evidence in the instant case to show that, after his termination from Think Tank, Bawa accessed its email system on several dates between February 24, 2022, and April 11, 2022. Kaur Dep. at 178–79. Bawa denies setting up the rule to forward automatically certain emails from Kaur's Think Tank email inbox to the Forwarding Gmail Account, an account with which Bawa attests he has no affiliation. ECF 100-12 (Bawa's Resp. to Req. for Admis.). But there is evidence in the record that Bawa was the only person at with the "super user administrative privileges" necessary to set up the forwarding rule. *See* ECF 116-19 (text chat between Kaur and Rackspace technical support).[4] Viewing the evidence in the light most favorable to Plaintiff, the Court finds a genuine dispute of material fact as to whether Bawa accessed Think Tank's email

---

[4] Defendants argue that Ms. Kaur has given "conflicting accounts of whether she had a superuser account by April 2022." ECF 100-1 at 13 (comparing Kaur Dep at 177:5-7 with ECF 100-11). Resolving this type of factual ambiguity is neither necessary nor proper at this stage.

system contemporaneously. Accordingly, summary judgment is denied as to Plaintiff's wiretap claims against Bawa in Counts VII and VIII.

However, there is no record evidence to suggest that, in accessing Think Tank's email system, Bawa was acting on behalf of ITegrity or that ITegrity separately committed any violation of the federal or state wiretap statutes. Therefore, ITegrity is entitled to summary judgment on Counts VII and VIII.

### H. Counts IX and X – State and Federal Stored Communications Act

In Counts IX and X of the SAC, Plaintiff asserts claims against Bawa under the federal and Maryland Stored Communications Acts. Bawa argues that Plaintiff cannot establish he accessed its communication system "without authorization." ECF 100-1 at 33. Specifically, Bawa argues that at all times, including to this day, he owns a 49% interest in Think Tank and his "ownership rights were not affected by his termination." *Id.* Accordingly, Bawa suggests, his access was authorized. Plaintiff argues that having a 49% ownership interest in the company did not automatically entitle Bawa to access the company's files and emails. ECF 116 at 26. Rather, "upon [Bawa's] termination as president on January 1, 2022, any authorization to use the account while he worked for the company was rescinded." *Id.*

Both the federal and state statutes provide a cause of action for certain statutory violations. *See* 18 U.S.C. § 2707; Md. Code Ann., Cts. & Jud. Proc. § 10-4A-08. To prevail under the federal Stored Communications Act, Plaintiff must show that Bawa: "(1) accessed a system through which electronic communication service is provided without authorization; (2) obtained a wire or electronic communication from the electronic storage system; and (3) acted intentionally." *Skapinetz v. CoesterVMS.com, Inc.*, Civ. No. PX-17-01098, 2019 WL 2579120, at *3 (D. Md. June

24, 2019) (citation omitted); *see also* 18 U.S.C. § 2701. The Maryland statute "mirrors its federal counterpart[.]" *Upshur v. State*, 56 A.3d 620, 625 (Md. 2012).

The phrase "without authorization" is not defined in either statute, but the phrase has been interpreted in other contexts to mean access "without any permission." *Van Buren v. United States*, 593 U.S. 374, 389 (2021) (interpreting the Computer Fraud and Abuse Act of 1986 ("CFAA")); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 495 (D. Md. 2005) (recognizing that the purpose of the Stored Communications Act "was to create a cause of action against computer hackers (e.g., electronic trespassers)") (cleaned up).

Think Tank's January 1, 2022, termination letter informed Bawa as follows: "As part of your termination, you may not log into any company accounts, including but not limited to emails, shared drive, financials, and contracts, without express written consent[.]" ECF 116-18 (Pl. Exh. 17) at 2. Thus, Think Tank expressly "revoked" Bawa's authority to access Think Tank's electronic accounts. *Werner-Masuda*, 390 F. Supp. 2d at 497. Bawa cites no authority to support his theory that a minority owner of a company holds unbridled authorization to access the company's email system, even if expressly prohibited from accessing company electronic accounts. Accordingly, summary judgment is denied as to Counts IX and X.

## I. Counts XI and XII – Federal Computer Fraud and Abuse Act

In Counts XI and XII of the SAC, Plaintiff asserts claims against Bawa and Rossi under the CFAA. Defendants argue that Plaintiff's claim against Rossi is barred by a two-year statute of limitations because Think Tank was aware that Rossi retained her Think Tank-issued laptop at least since June 2019, when it issued a preservation letter, but did not file suit until April 2022. ECF 100-1 at 30 (citing 18 U.S.C. § 1030(g)). Further, Defendants argue, there is no record evidence that either Bawa or Rossi committed any violation of the statute. *Id.* at 30–32. Plaintiff

offers no argument and cites no evidence to oppose summary judgment in favor of Bawa and Rossi on these claims. As explained above, "a plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim." *Rodgers*, 586 F. Supp. 3d at 448 (collecting citations). Plaintiff's failure to respond to Defendants' arguments constitutes abandonment of its CFAA claims against Bawa and Rossi. Thus, these Defendants are entitled to summary judgment on Counts XI and XII.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 100) is granted in part and denied in part. The Motion is denied as to Plaintiff's claim in Count I for breach of fiduciary duties against Bawa for directing Plaintiff's work to ITegrity. The Motion is also denied as to Plaintiff's claims against Bawa in Counts VII, VIII, IX and X for violations of the federal and Maryland Wiretap and Stored Communications Acts. The foregoing claims will proceed to trial. In all other respects, the Motion is granted. Summary judgment is entered in favor of Bawa on all remaining claims, and summary judgment is entered in favor Rossi and ITegrity on all claims asserted against them.

A separate Order will issue.


  3/31/26                                       /S/
Date                                    Matthew J. Maddox
                                        United States District Judge

34